# ORIGINAL

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
## CIVIL DIVISION

A 1 5 0 6 3 0 4

| | | |
|---|---|---|
| **RYAN & CYNTHIA TANNER** | : | Case No: |
| 401 KUNTZ DRIVE | : | |
| LEBANON, OH 45036 | : | JUDGE |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **COMPLAINT** |
| **v.** | : | **& JURY DEMAND** |
| | : | |
| **ABUBAKAR ATIQ DURRANI, M.D.** | : | |
| Pakistan | : | |
| (Served via Hague Convention) | : | |
| | : | |
| And | : | **D112656096 INI** |
| | : | |
| **CENTER FOR ADVANCED SPINE** | : | (ALL NEW DR. DURRANI CASES |
| **TECHNOLOGIES, INC.** | : | SHALL GO TO JUDGE |
| (Served via Hague Convention) | : | RUEHLMAN PER HIS ORDER) |
| | : | |
| And | : | |
| | : | |
| **JOURNEY LITE OF CINCINNATI, LLC:** | |
| 10475 READING RD., SUITE 115 | : | |
| CINCINNATI, OH 45241 | : | |
| | : | |
| SERVE: CT CORPORATION SYSTEM | : | |
| 1300 EAST NINTH STREET | : | |
| CLEVELAND, OH 44114 | : | |
| (Serve via Certified mail) | : | |
| | : | |
| **Defendants.** | : | |

*REGULAR MAIL WAIVER*

FILED

2015 NOV 19 P 1: 50

TRACY WINKLER
CLERK OF COURTS
COUNTY, OH

---

Comes now Plaintiffs, Ryan and Cynthia Tanner, and file this Complaint and jury

demand and states as follows:

1.    At all times relevant, Plaintiff/Plaintiffs were residents of and domiciled in the

State of Ohio.

2.    At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr.

1



Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.      At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4.      At all times relevant, Journey Lite of Cincinnati, LLC ("Journey Lite") was a Delaware corporation transacting business and performing and managing medical services in the State of Ohio and held itself out to the public, and specifically to the Plaintiff as a center providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

5.      The amount in controversy exceeds the jurisdictional threshold of this Court.

6.      The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.  This Court is thus the proper venue to grant Plaintiff the relief sought.

7.      This case was previously set for trial and Plaintiff's 41(A) Voluntarily Dismissed this case and are now re-filing this case.

## FACTUAL ALLEGATIONS OF PLAINTIFF

8.      In or around 2012 Mr. Tanner experienced pain in his neck and burning in his right shoulder and arm.

9.      Plaintiff's friend had previously undergone surgery with Dr. Durrani and referred Mr. Tanner to him.

10. In or around December 2012, Mr. Tanner visited Dr. Durrani for an initial consultation at CAST in Blue Ash.

11. Following the initial consultation, Dr. Durrani ordered an MRI and x-ray to be taken Bethesda Arrow Springs in Lebanon.

12. Dr. Durrani also ordered an epidural injection for Mr. Tanner.

13. The epidural injection provided Mr. Tanner no relief.

14. Mr. Tanner visited Dr. Durrani for a follow up appointment after the MRI and x-ray.

15. Dr. Durrani told Mr. Tanner he needed a procedure done on his C5, C6, and C7.

16. Dr. Durrani further told Mr. Tanner he did not want to do a fusion of that area because Mr. Tanner had a prior fusion done on the C3, C4, and C5 by another doctor.

17. Dr. Durrani explained the procedure to Mr. Tanner by stating that he would drill a hole in the affected area, which would relieve the compression.

18. Dr. Durrani told Mr. Tanner, who is a police officer, he would be back in uniform in ten weeks.

19. On or about March 22, 2013, Dr. Durrani performed surgery on Mr. Tanner at Journey Lite.

20. Following the surgery, Mr. Tanner experienced pain relief for a month.

21. A month following the surgery, Mr. Tanner's pain returned and intensified.

22. Mr. Tanner experienced severe pain in his neck, weakness and cramping in his right arm, and loss of feeling in his right hand.

23. Approximately six weeks after surgery, Plaintiff visited Dr. Durrani for a follow up appointment.

3

24.     During the follow up appointment, Mr. Tanner told Dr. Durrani his pain had increased, and that he was experiencing numbness.

25.     Upon information and belief, Dr. Durrani seemed annoyed that Mr. Tanner's pain and new symptoms had returned.

26.     Dr. Durrani recommended that Mr. Tanner undergo nerve block injections for his pain.

27.     Mr. Tanner was not comfortable with receiving nerve block injections.

28.     Mr. Tanner visited Beacon Orthopedics to see a specialist, Dr. Ian Rodway.

29.     Mr. Tanner had another MRI and x-ray taken at Beacon Orthopedics.

30.     Dr. Rodway recommended Mr. Tanner undergo fusion at the C6 to C7.

31.     On or about December 19, 2013 Mr. Tanner had a fusion of his C6 and C7 with Dr. Rodway.

32.     Mr. Tanner's pain level decreased after his surgery, however he still has a limited range of motion and occasional pain.

33.     Mr. Tanner has experienced economic hardship, as he has been unable to pick up extra-duty detail for extra money.

34.     Mr. Tanner now has difficulty performing daily household chores, interacting with his children and wife, and has difficulty coaching youth sports.

35.     Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

36.     As a direct and proximate result of Mr. Tanner's surgery, Dr. Durrani's negligence, and the Defendants negligence, Mr. Tanner has suffered harm.

37.     Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

38.     As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiff has suffered harm.

39.     Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiff's bills.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

40.     This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

41.     Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

42.     Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

43.     Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

44.     Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

45.     Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

46.     Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

5

47.     According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

48.     According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

49.     Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

50.     Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

51.     At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

52.     Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries.  They did nothing.

53.     Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

54.     Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

55.     Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

56.     Dr. Durrani would schedule two to three spine surgeries a day at Children's.

6

57.     Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

58.     Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

59.     Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

60.     There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

61.     Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

62.     Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

63.     Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

64.     Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

65.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

7

66.    Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

67.    While doing research at Children's, Dr. Durrani would misstate facts regarding his research.  Children's knew he did this.

68.    Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

69.    Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

70.    Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

71.    On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

## DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

72.    Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

73.    Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but

8

not limited to improper selection for surgeries, improper performance of the surgeries, and improper follow-up care addressing a patient's concerns.

74.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: BATTERY

75.     Dr. Durrani committed battery against Plaintiff by performing a surgery(ies) that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

76.     Plaintiff would not have agreed to the surgeries if they knew the surgeries was/were unnecessary, not approved by the FDA, and not indicated.

77.     As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

78.     The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

79.     In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgeries.

80.     Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or

potentially involved with his surgeries and procedures.

81.     Had Plaintiff been appropriately informed of the need or lack of need for

surgeries and other procedures and the risks of the procedures, Plaintiff would not have

undergone the surgeries or procedures.

82.     As a direct and proximate result of the lack of informed consent, Plaintiff

sustained all damages requested in the Prayer for Relief.

### COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

83.     Dr. Durrani's conduct as described above was intentional and reckless.

84.     It is outrageous and offends against the generally accepted standards of

morality.

85.     It was the proximate and actual cause of Plaintiff's psychological injuries,

emotional injuries, mental anguish, suffering, and distress.

86.     Plaintiff suffered severe distress and anguish so serious and of a nature that no

reasonable man or woman would be expected to endure.

### COUNT V: FRAUD

87.     Dr. Durrani made material, false representations to Plaintiff and their insurance

company related to Plaintiff's treatment including: stating the surgeries were necessary,

that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary

and futile, that the surgeries would be simple or was "no big deal", that Plaintiff would be

walking normally within days after each surgeries, that the procedures were medically

necessary and accurately reported on the billing to the insurance company, that the

surgeries was successful, and that Plaintiff was medically stable and ready to be discharged.

88. Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgeries, as well as other information, when he had a duty to disclose to Plaintiff his planned use of the same.

89. These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo his surgeries.

90. Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

91. Dr. Durrani made the misrepresentations before, during and after the surgeries with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

92. The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

93. Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

94. As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

## COUNT VI: SPOLIATION OF EVIDENCE

95. Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

96. Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

97. Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VII: LOSS OF CONSORTIUM

98. At all times relevant, the Plaintiffs were married.

99. As a result of the wrongful acts and omissions of Dr. Durrani, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of fellowship, all to the detriment of Plaintiff's marital relationship .

100. All the aforesaid injuries and damages were caused proximately by the acts and omissions of Dr. Durrani.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

101. At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

102. Dr. Durrani is in fact, the owner of CAST.

103.    Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

104.    Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

105.    Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

106.    As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.

**COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION**

107.    CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

108.    CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

109.    CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

110.    The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

111.    Such disregard for and violations of federal law represents strong evidence that

13

CAST negligently hired, retained, and supervised Dr. Durrani.

112.    As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: SPOLIATION OF EVIDENCE

113.    CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

114.    CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

115.    CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

116.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

117.    CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

118.    CAST omitted suppressed and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions and concealments as set forth herein.

119.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and

practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

120.    CAST was fully aware of its actions.

121.    CAST was fully aware that Plaintiff was induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiff.

122.    Had Plaintiff been aware that CAST's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

123.    CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

124.    CAST's actions were not the result of any bona fide errors.

125.    As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

      a.  Loss of money paid

      b.  Severe aggravation and inconveniences

      c.  Under O.R.C. 1345.01 Plaintiff is entitled to:

            i.  An order requiring that CAST restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

           ii.  All incidental and consequential damages incurred by Plaintiff;

          iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT III: FRAUD

126.    CAST sent out billing to Plaintiff at her home following her surgeries at Journey Lite Hospital.

127.    The exact dates these medical bills were sent out are reflected in those medical bills.

128.    These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

129.    The bills were sent with the knowledge of CAST that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at Journey Lite Hospital associated with Dr. Durrani were not appropriate.

130.    The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

131.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

132.    As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

133.    CAST also either concealed from Plaintiff that they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries, and the particular risks that were involved therein.

16

134.    CAST's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

135.    Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

136.    CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Journey Lite Hospital.

137.    Plaintiff was unaware that BMP-2 and/or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 and/or Puregen's use in Plaintiff's spine.

138.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at Journey Lite Hospital.

139.    As a direct and proximate result of the fraud against plaintiff by CAST, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT V: LOSS OF CONSORTIUM

140.    At all times relevant, the Plaintiffs were married.

141.    As a result of the wrongful acts and omissions of CAST, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of

affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

142.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of CAST.

## JOURNEY LITE OF CINCINNATI, LLC COUNTS:

### COUNT I: VICARIOUS LIABILITY

143.    At all times relevant, Defendant Dr. Durrani was an agent, apparent agent, and/or employee of Journey Lite.

144.    Dr. Durrani is in fact, a partial owner or shareholder of Journey Lite.

145.    Defendant Dr. Durrani was performing within the scope of his agency, real or apparent with Journey Lite during the care and treatment of Plaintiff.

146.    Defendant Journey Lite is responsible for harm caused by acts of its agents and apparent agents for conduct that was within the scope of agency under the theory of respondeat superior.

147.    Defendant Journey Lite is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

148.    As a direct and proximate result of Defendant Journey Lite's acts and omissions, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

### COUNT II: NEGLIGENT CREDENTIALING & RETENTION

149.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute physician negligence and medical malpractice.

18

150.    Journey Lite negligently credentialed and retained Dr. Durrani as a credentialed physician by:

      a.  Allowing Dr. Durrani to repeatedly violate the Journey Lite bylaws with it's full knowledge of the same;

      b.  Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for privileges at Journey Lite;

      c.  Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Journey Lite staff, Dr. Durrani's patients and by others;

      d.  Ignoring Dr. Durrani's previous privilege terminations from other Cincinnati area hospitals, including Children's Hospital, Deaconess Hospital, Good Samaritan Hospital, Christ Hospital and West Chester Hospital.

151.    The Safe Medical Device Act required entities such as Journey Lite to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

152.    Such disregard for and violations of federal law represents strong evidence that Journey Lite negligently granted and retained privileges for Dr. Durrani.

153.    As a direct and proximate result of the negligent credentialing and retention of Dr. Durrani, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment that Plaintiff would not otherwise have incurred had Dr. Durrani not been credentialed by Journey Lite.

## COUNT III: FRAUD

154. Ohio Administrative Code 3701-83-07(A)(5) states, "Each patient shall receive, if requested, a detailed explanation of facility charges including an itemized bill for services rendered.

155. The bills sent to Plaintiff, after multiple requests, were in violation Ohio Administrative Code 3701-83-07(A)(5).

156. Even after Plaintiff's Counsel and the Ohio Attorney General requested itemized billing, Journey Lite still did not provide an itemized breakdown of the charges; instead Journey Lite continued to provide "Account Ledgers," which contained barebones "Insurance Billing" and "Insurance Payments."

157. Due to Journey Lite's downright refusal to comply with Plaintiff's request for itemized billing, Plaintiff has been forced to file a class action suit against Journey Lite's for their egregious billing practices.

158. The bills sent by Journey Lite to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

159. Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that Journey Lite Hospital falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

160. The bills were sent to Plaintiff's insurance company with the knowledge of Journey Lite that in fact Plaintiff's surgeries were not appropriately billed and

20

documented and that the services rendered at Journey Lite associated with Dr. Durrani were not appropriate.

161. Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiffs for Journey Lite's services in association with Dr. Durrani's surgeries.

162. As a direct and proximate result of this reliance on the billing of Journey Lite, Plaintiff incurred medical bills that she otherwise would not have incurred.

163. Because of its superior position and professional role as a medical service provider, Journey Lite had a duty to disclose these material facts to Plaintiffs and a duty to refrain from misrepresenting such material facts to Plaintiffs.

164. Journey Lite intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Journey Lite.

165. As a direct and proximate result of the fraud upon Plaintiffs by Journey Lite, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: SPOLIATION OF EVIDENCE

166. Journey Lite through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, paperwork and related evidence.

167. Journey Lite through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

21

168.    Journey Lite's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT V: OHIO CONSUMER SALES PROTECTION ACT

169.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

170.    Journey Lite's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

171.    Journey Lite omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

172.    Journey Lite's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

173.    Journey Lite was fully aware of its actions.

174.    Journey Lite was fully aware that Plaintiffs were induced by and relied upon Journey Lite's representations at the time Journey Lite was engaged by Plaintiffs.

175.    Had Plaintiffs been aware that Journey Lite's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

176.    Journey Lite, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

177.    Journey Lite's actions were not the result of any bona fide errors.

22

178.   As a result of Journey Lite's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

    a.   Loss of money paid

    b.   Severe aggravation and inconveniences

    c.   Under O.R.C. 1345.01 Plaintiffs are entitled to:

        i.   An order requiring Journey Lite restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

        ii.   All incidental and consequential damages incurred by Plaintiffs;

All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

### COUNT V: LOSS OF CONSORTIUM

179.   At all times relevant, the Plaintiffs were married.

180.   As a result of the wrongful acts and omissions of Journey Lite, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

181.   All the aforesaid injuries and damages were caused proximately by the acts and omissions of Journey Lite.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.   Past medical bills;

2.   Future medical bills;

3.      Lost income and benefits;

4.      Lost future income and benefits;

5.      Loss of ability to earn income;

6.      Past pain and suffering;

7.      Future pain and suffering;

8.      Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.      Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-2307.80 and applicable law;

10.     All incidental costs and expenses incurred as a result of their injuries;

11.     The damages to their credit as a result of their injuries;

12.     Punitive damages;

13.     Costs;

14.     Attorneys' fees;

15.     Interest;

16.     Loss of Consortium

17.     All property loss;

18.     All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307)

## AFFIDAVIT OF MERIT
### FOR RYAN TANNER

I, Andrew Collier, MD, after being duly sworn and cautioned state as follows:

1. I have made a preliminary review of all relevant medical records and other information provided to me regarding the above named patient concerning the allegations in his lawsuit filed or to be filed. (I'm fully aware of the lawsuits and claims being filed in what is referred to as the Durrani litigation.)

2. Based upon my preliminary review of the medical records and other information provided to me, my education, training and experience, it is my opinion, based upon a reasonable degree of medical probability that the Defendants, Dr. Durrani, CAST and Journey Lite deviated from the standard of care for the care and treatment of the above named patient, including lack of informed consent, and that deviation proximately caused harm and damages to the above named patient.

3. I devote at least one half of my professional time to the active clinical practice in my field of licensure, or its instruction to an accredited school.

4. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

5. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

6. The facts support the patient's claim for negligence, battery, lack of consent and fraud.

7. As a result of the negligence and conduct, the patient suffered damages proximately caused by them, including the following:

   A. Permanent disability
   B. Physical deformity and scars
   C. Past, Current and Future Physical and Mental Pain and Suffering
   D. Lost income past, present and future
   E. Loss of enjoyment of life
   F. Past medical expenses
   G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
   H. Aggravation of a pre-existing condition
   I. Decreased ability to earn income

AFFIANT SAYETH FURTHER NOT

_____
ANDREW COLLIER, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by Andrew

Collier, M.D. on this _15_ day of _November_ 2015.

_____
NOTARY PUBLIC
My Commission Exp.: _11/27/18_
_Burlington_ County
State of _New Jersey_

KATHLEEN A. COLLIER
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 11/27/2018

### AFFIDAVIT OF MERIT
### FOR RYAN TANNER

I, Andrew Collier, MD, after being duly sworn and cautioned state as follows:

1. I have made a preliminary review of all relevant medical records and other information provided to me regarding the above named patient concerning the allegations in his lawsuit filed or to be filed. (I'm fully aware of the lawsuits and claims being filed in what is referred to as the Durrani litigation.)

2. Based upon my preliminary review of the medical records and other information provided to me, my education, training and experience, it is my opinion, based upon a reasonable degree of medical probability that the Defendants, Dr. Durrani, CAST and Journey Lite deviated from the standard of care for the care and treatment of the above named patient, including lack of informed consent, and that deviation proximately caused harm and damages to the above named patient.

3. I devote at least one half of my professional time to the active clinical practice in my field of licensure, or its instruction to an accredited school.

4. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

5. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

6. The facts support the patient's claim for negligence, battery, lack of consent and fraud.

7. As a result of the negligence and conduct, the patient suffered damages proximately caused by them, including the following:

   A. Permanent disability
   B. Physical deformity and scars
   C. Past, Current and Future Physical and Mental Pain and Suffering
   D. Lost income past, present and future
   E. Loss of enjoyment of life
   F. Past medical expenses
   G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
   H. Aggravation of a pre-existing condition
   I. Decreased ability to earn income

AFFIANT SAYETH FURTHER NOT

ANDREW COLLIER, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by Andrew

Collier, M.D. on this ___15___ day of _December_ 2015.

NOTARY PUBLIC
My Commission Exp.: 11/27/18
_____County
State of _New Jersey_

KATHLEEN A. COLLIER
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 11/27/2018



## COMMON PLEAS COURT
## HAMILTON COUNTY, OHIO

Ryan & Cynthia Tanner

CASE NO. **A 1 5 0 6 3 0 4**

VS

**WRITTEN REQUEST FOR SERVICE**
**TYPE OF PAPERS TO BE SERVED ARE**

Abubakar Atiq Durrani, MD, et al.

Complaint & AOM

(☐) **PLEASE CHECK IF THIS IS A DOMESTIC CASE**

**PLAINTIFF/DEFENDANT REQUESTS:**

**EXPRESS MAIL SERVICE** _____

**CERTIFIED MAIL SERVICE** _X_____

**REGULAR MAIL SERVICE** _____

**PERSONAL SERVICE** _____

**RESIDENCE SERVICE** _____

**PROCESS SERVICE** _____

**FOREIGN SHERIFF** _____

ON Journey Lite of Cincinnati, LLC; Serve: CT Corporation System

1300 East Ninth Street,Cleveland, OH 44114

FILED 2015 NOV 19 P 1: 50

TRACY WINKLER CLERK OF COURTS HAMILTON COUNTY OH

## Matthew J. Hammer

**ATTORNEY**

5247 Madison Pike Independence, KY 41051

**ADDRESS**

## 859-363-1900

**PHONE NUMBER**

92483

**ATTORNEY NUMBER**

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

REQUEST AND INSTRUCTIONS FOR ORDINARY MAIL SERVICE

Ryan & Cynthia Tanner
_____
**Plaintiff**

-vs-

Journey Lite of Cincinnati, LLC
_____
**Defendant**

**INSTRUCTIONS TO THE CLERK**

**A 1 5 0 6 3 0 4**

**CASE NUMBER:** _____

**IF SERVICE OF PROCESS BY CERTIFIED MAIL IS RETURNED BY THE POSTAL AUTHORITIES WITH AN ENDORSEMENT OF "REFUSED" OR "UNCLAIMED" AND IF THE CERTIFICATE OF MAILING CAN BE DEEMED COMPLETE NOT LESS THAN FIVE (5) DAYS BEFORE ANY SCHEDULED HEARING, THE UNDERSIGNED WAIVES NOTICE OF THE FAILURE OF SERVICE BY THE CLERK AND REQUESTS ORDINARY MAIL SERVICE IN ACCORDANCE WITH CIVIL RULE 4.6 (C) OR (D) AND CIVIL RULE 4.6 (E).**

## Matthew J. Hammer
_____
**ATTORNEY OF RECORD**          **(TYPE OR PRINT)**

## \s\Matthew J. Hammer
_____
**ATTORNEY'S SIGNATURE**

_____
**DATE**

FILED

2015 NOV 19 P 1: 50

TRACY WINKLER
CLERK OF COURTS
COUNTY, OH